Good morning. May it please the Court, my name is Mindy Novick and I represent the City of Desert Hot Springs and Walter McKinney. I'd like to reserve two minutes for rebuttal. As we have set forth in our briefs, we believe that the judgment of the lower court must be reversed for several reasons. But there's one key reason, and that is the first issue that was raised in the briefs, that if this Court were to reverse the district court, it moots all the other issues that have been raised on appeal. And that is whether or not the district court's decision as a matter of law that the city could not extend the probationary period for Sergeant Duffy was, in fact, a denial of due process. If this Court reverses the district court's ruling in that regard, then there are no other issues remaining, because by imputation and inference in reaching that decision, you would find that there was no – that there was no – excuse me, that there was a set-forth established formal policy and custom. On the other hand, if the decision is affirmed, it means by implication that there was, in fact, no official policy or custom, and therefore, there cannot be liability for the city under Monell or against Mr. McKinney on the basis of qualified immunity. So what I'd like to address first is the issue of whether or not there was, in fact, a denial of due process. And we submit that the lower court misread the memorandum of understanding between the city and the police association and held that there was a conflict between that memorandum of understanding, which is, in fact, a negotiated agreement, and the city's personnel rules, which are not a contract. And therefore, there was not a conflict between those two documents, but rather they need to be read in concert with each other. And in the personnel rules, in the provisions under 3G, it says that, in fact, new employees are subject to a six-month probationary period and then a six-month extension of the probationary period. It doesn't make a distinction between sworn or unsworn personnel or police officers and non-police officers. And it refers solely to new employees. It doesn't make a distinction as to whether somebody is entry-level or whether they have prior experience. So it is our position that that is not in conflict with the provisions of the memorandum of understanding, which sets forth the probationary period for police officers and doesn't make a distinction between new and, for instance, promotional period, but rather just says that the probationary period for an entry-level police officer, which would be somebody who has no academy, was not an academy graduate or has no prior police experience, would be 18 months, and that somebody with experience but still new to the city would have a 12-month probationary period. And the memorandum of understanding goes on to say that if there's a conflict, and only if there's a conflict, then the memorandum of understanding would control. Now, I just want to make sure I understand the argument. If I read the plain language of Article 7 of the MOU, it makes a distinction between entry-level and laterals. Correct. And Duffy's a lateral. Yes, he is. Okay. So if I'm an entry-level, then I would be subject to 18 months, right? Correct. And if I'm a lateral, I've got 12 months probation. That's correct. And then you go over to the probationary period under the city personnel rules, and it talks about probationary period for new employees. Right. Okay, so you're reading the lateral as a new employee, even though he's not an entry-level employee. Exactly right. So what you're saying, then, the city can create a probationary period unilaterally, increase it from 18 to 24 months for entry-level. Yes. And to 18 months for a lateral. Exactly right. Because, again, in the MOU in Article 21, it states that when there's a, you know, that the personnel rules apply to all employees. And if a particular issue is not covered explicitly in the memorandum of understanding, then the employee, whether it's a police officer or not, is subject to the rules that are set forth. And that gives the city, the city council, the right to make a rule, which they have done, which permits for an extension of probation for a six-month period. What do we do with the part of the MOU which, in essence, says if it's not in the MOU, it can't be considered, it's not a rule, it has no application? You're only referring to the, call it the zipper clause at the end of the agreement. And you have to read that, I think, in conjunction with the entire provisions, all the provisions of the MOU, as well as the rules. And what that tells us is that in that same agreement, it says if it's not been raised, you can't by implication assume that something is in that MOU. The MOU is silent on the question of the extension of a probationary period. So by default, we have to go to the rules, which the city council have enacted as they have the right to do, and have made the policy that there is the ability to extend the probationary period. And again, because they haven't distinguished in the personnel rules by lateral versus a entry level. But it's covered in the MOU. If it's not in the MOU, it's not supposed to be considered. Well, Your Honor, I wasn't present at the negotiations, and it's not part of the record as to what the parties did or did not discuss during the negotiations. So we have to look at the four corners of the agreement, and it's silent. And in every case that's been decided on the issue of whether an extension of a probationary period was permissible, and the cases we found go back to 1942, regardless of the language of the particular. Can I come back? I didn't, through my own confusion, follow the syllogism I got you through halfway. I'm sorry, Your Honor. Because as I read the personnel rules, it says the probationary period for new employees shall be six months, and allows an extension of six months. So for everybody other than these police officers who come in under the MOU, the maximum probationary period for new employees is 12 months. Correct. Okay. So what you're saying is that this MOU contemplated, notwithstanding its language, a probationary period that for new employees would be double that of any other new employee, and for a lateral, it would be an additional six months. Yes, Your Honor. And what was it about these lateral cops that you guys were so concerned about that you wanted to create an extraordinary long probationary period that didn't apply to any other city employee? Well, Your Honor, I think the distinction is the difference between a police officer and other city employees. I mean, what is expected of them. Well, this would apply to new employees if you were hiring police officers directly, not, you know, take. I mean, this isn't limited. The MOU has to do with taking over another police agency, right? Not taking over another police agency. It's hiring a police officer who had worked previously for some other police department or had some other law enforcement experience. But he does have no history with the City of Desert Hot Springs, and then the chief of police in the City of Desert Hot Springs doesn't have anything to do with that. So police officers hired in Desert Hot Springs were hired under the MOU? Correct. There were no other entry positions into law enforcement or fire or anything else that would be? Not that pertain to this MOU. No, no. I'm talking about under the personnel manual would apply to. Okay. I'm sorry, Your Honor. The personnel rules will apply to all employees other than the police department. There is a fire department. There is an animal control department. But the rules particular to the police officers, because of the requirements under state law for police officers, they are required to either have post-certified training. CORAC and all of that, sure. I mean, yeah, post-certification, right, yeah. So, yeah, so that is the reason why. There is a heightened scrutiny for a police officer that's coming on board, whether they have prior experience or not. The very concerns that were raised in this case with regard to Mr. Duffy's performance during his probationary period are the reasons why case law has consistently held that, particularly with police officers, that an extended period of probation would be necessary. In terms of just interpreting the contract, the Restatement of Contracts tells us that we should try to interpret the contract if there's a silent – if it's silent as to an issue. You know, I have real – I mean, you know, I take your point. I mean, I was a police commissioner. I understand police being special in all of those circumstances. But I also know that the cops are pretty good about negotiating memorandum – memorandum of understanding that they're negotiated. And I guess my problem is to say, well, we can agree to explicitly have a provision that agrees to a probationary period and then invoke through a personnel policy, which you say shouldn't be applied to police officers because of their special status, but we can use it – we can use it to grab a section out of that to extend, in addition to the probationary period that's set forth in Article 8 of the MOU, an additional six months, which takes, then, well beyond any other employee in the city of Desert Hot Springs would be subjected to. I think, Your Honor – It's just – it's hard to fathom. But what – the one point that you've just raised is actually covered in the MOU, which says that if it's not in the MOU, that the police officers are controlled by all the other rules that are set forth in the city's rules. And there are some things in there that aren't contained in the MOU. And those things would apply. Point me to the language. I'm going to see that language, because it is covered in the MOU. Probationary period. That's the whole Section 8. But so tell me what the language is that says they should have also picked up on the fact that the personnel policy probationary language would supplement what's in here. There is, of course, Your Honor, nothing that explicit that says when you read Article 8, don't you also go to Rule 4G?  So what is it? What's the language you're relying on? But in Article 21 of the agreement, it says that the personnel rules of the city apply to police employees unless there is a conflict between the MOU and the rules, and then the MOU will control. Here, there's no conflict. No, wait, wait, wait, wait. Okay. Article 21. 21. Okay. It's page 240 and 241 of the record. All right. Yeah, I see. Employees shall adhere and be subject to the personnel rules and regulations except that in the case of a conflict between the personnel rules and regulations, this MOU shall be controlling. Okay. And you say, well, there's no conflict. This is just a simple add-on to a provision that's negotiated in the MOU. Well, you just slip that in. There's no conflict because if you take our view, it's an add-on. If you take their view, it's going contrary to the limits that were set by the MOU. Could the police officer say, well, I'm a new employee, so it's only six months, and then you can add six. That would be a conflict, Your Honor. The agreement, the MOU. I know it sounds like I'm being just a little, you know, facile with that, but the MOU spells out particular period of probation, but doesn't address the issue of the extension. The rules have a specific time period for other employees and then gives the right to the city manager to extend probation for a new employee. And you ever heard the expression pushing a rope uphill? Not quite that way, Your Honor, but I get what you mean. But I think also as a public policy matter, the interpretation that we are submitting here is the appropriate one. I don't understand why as a matter of public policy we need to go beyond what the parties carefully negotiated with the police officers. You had your chance. The city had its chance to negotiate what they wanted with the police officers, and you got it. You got a firm 12-month probationary period, which is six months longer than any other new employee. But, Your Honor, again, it's not in the record. We don't know what happened. You got 18 months in the case of a new employee. Not having in the record what happened during negotiations, and no one testified as to that. Whatever happened, the MOU is what resulted, and that is with the officers' union that negotiated it, I guess. That's where it got negotiated. So I don't know that we should sit as an appellate court deciding what is a matter of public policy. We should weigh in favor of the city when the city negotiated what it wanted in the MOU. Your Honor, with all due respect, I think that the fact that there's not a conflict, we can speculate as to what happened during the negotiations. But, for instance, if there was an impasse on that issue, and so they agreed on what they agreed to, which then by default means that whatever is left that hasn't been addressed, it's silent as to whether or not there can be that explanation. I think we've got your argument there. I just want to ask a quick question about qualified immunity. Sure. What was your basis for qualified immunity for Chief McKinney? Yeah. Chief McKinney, if you look at the job description for the police chief, nowhere in that description does it give him any authority to make rules. No. What's his basis for qualified immunity?    You're not talking about the chief's authority. In other words, you're saying because he's not a decision-maker.  Just as the beginning, that's Monell. But he also, as somebody who did not make the policy, he can only rely on he's entitled to the reasonable relief of what anybody in his position as a police officer would believe was the appropriate procedure. And here he conferred with the city manager, Jerry Hansen, who did not tell him that he could not extend the probationary period. And, in fact, he reasonably relied on that discussion that he had with the city manager. It was an advice of counsel defense, in essence. Well, in essence, although it's not counsel. No. But, in fact, subsequently, counsel does take the same position in response to the letters of contesting the termination that was submitted by Sergeant Patrick. And this argument was presented to the district court? Yes, Your Honor. But not in your Rule 50b? It was addressed in both the summary judgment motions as well as the earlier. But you did not appeal the summary judgment motion interlocutory. So you lose there.  I'm not sure if you're referring to the drug motions, Rule 50 motions during jury instructions. If the issue was raised during the trial. No, but there's a rule that if you are claiming qualified immunity and you think you're entitled to it, if there's a ruling against you at summary judgment, they said there, there were disputes of fact. You should have gone up on an interim appeal right there. If you don't, the issue is lost. But, Your Honor, the judge did not rule that it didn't exist. There was the ruling at summary judgment motion stage was that the judge needed more to hear the evidence before she could reach decisions on these issues. So while there was a denial, there was really still the facts to be developed and then a final ruling to be made. I see that my time is up. Yeah. All right. I think we have it in your brief. Good morning. My name is Glenn Roth and I represent Michael Duffy. I'd like to respond to a couple of points very briefly. First, the district court found correctly that the qualified immunity argument the defendants raised on appeal was waived by the failure to raise it in the Rule 50 motion. Second, counsel asserted that there was a rule of the police department permitting the police department to extend probation. There was no such rule. There's nothing in the record that suggests that the police department had a rule to that effect. The operative instruments are the MOU and the personnel rules of the city at large. Second, there was some evidence concerning the experience of the parties under the MOU. The chief of police, the supervising lieutenant of Sergeant Duffy and the director of human resources all testified that until Sergeant Duffy's probation had been extended, no other sworn officer had ever had probation extended. Unless there are any other questions or unless there are any questions from the court on the defendants' appeal, I would like to turn to our cross-appeal. And I'm going to limit my argument to, of course, the question of fees and the relatedness of the plaintiff's two claims and whether success on one, but not the other, warrants a reduction in the loan stock. Before discussing the degree of factual and legal relatedness between the First and Fourteenth Amendment claims, I'd like to address the question whether this Court if it agrees with us, should remand the factual relatedness question to the district court or resolve it itself at this stage. And we urge the Court to do the latter and offer the example of Lipset v. Blanco, cited in our brief on other grounds, in our principal brief. But particularly the passage in that case at 975 F. 2nd, pages 943 and 44, where the First Circuit noted that the record was sufficiently developed that the court of appeals could apply the facts to the law before it, noting that that was a route that was available to it, that the court of appeals had chosen. It expressly followed the admonition in Hensley that the request for attorney's litigation. So in the interest of conserving resources of the court and achieving a fair and just result in an expeditious manner, the court resolved that question itself. Not the question of relatedness. It was another fee reduction question. But we think you can do the same with relatedness. Here's the issue. I mean, it's clearly a simpler case if you're going strictly on the MOU and whether or not there was an entitlement to a due process hearing, whether it's a property right. When you get into motive and retaliation and all of that, you take on a different kettle of fish. And the district court was concerned that there was some over-litigation here and that it went well beyond what was necessary. So if you take out the First Amendment issue, doesn't the case become pretty obviously a simpler case? We thought so, which is why we filed a motion for summary judgment. And ultimately, the district court, which did not decide that issue at summary judgment, decided it in our rule, motion for judgment as a matter of law, under Rule 50, and agreed with hindsight that, in fact, the MOU was unambiguous and could and should have been resolved on summary judgment. Although, to be fair to the district court, the district court didn't say I should have resolved it on summary judgment. But let's strip the case of the constitutional rubric. Let's put Sergeant Duffy as Michael Duffy in some private sector job. Michael Duffy gets fired, comes to us and says, I got fired. I think I have two reasons for contesting my termination. One is that they breached my contract, those rules of the workplace, whether they're found in a handbook or elsewhere, that make up the employment contract. And the other is that I think they were discriminating against me or retaliating against me. This is what we call in the employment context a concern about wrongful termination. And in wrongful termination litigation, those two kinds of claims are often joined for purposes of litigation. They're joined because they focus on the same core of facts, the core of facts being that employment relationship leading to the act of termination. And the only thing that the retaliation or discrimination claim adds to the mix is the nuance of moments. Now, had we been looking at this question of relativeness and we applied that scenario that I just gave without the constitutional rubric, I don't think it would have been a close case for the district court. It certainly hasn't been a close case for any of the courts that have looked at relatedness in the context of employment litigation, whether in this circuit or in others. We cited Blitzett v. Blanco for the court's approval, the circuit court's approval, that's the First Circuit, of the district court's conclusion that an unsuccessful procedural due process and a successful discrimination claim both stemming from the plaintiff's termination, quote, shared a tightly wrapped core of common facts, 975F3rd at 940 and 41. That case is in this regard on all fours with the case before you with one exception, success on the discrimination claim, failure on the procedural due process claim. But the standard is the one that I just read. Whether there's a common core of fact or a common course of condom. And we have found only one decision of this court that addresses this question of relatedness in the context of employment litigation. Lumatz-Odomo v. Weston Tucson Hotel, 53F3rd, 1484. There, the employee prevailed on his claims under Title VII and Section 1981, alleging discrimination with regard to his unsuccessful attempts to transfer out of the hotel laundry. But he did not prevail on his state law tort claims, alleging wrongful termination, constructive discharge, retaliation, and intentional infliction of emotional distress. The difference between those two was not just the question or what I would characterize as the nuance of motive. They addressed different incidents of the employment relationship. Prior to termination, efforts over a considerable period of time on the part of this educated man to try to get a job outside the hotel laundry, on the one hand, and on the other hand, his termination. Or as he characterized it, constructive discharge. Neither the district court nor this court had any question about whether these were related because they described that common core of facts as focusing on the plaintiff's employment relationship. Well, I don't think you have to go that far. I mean, let's say that Odomo is an outlier because, although it's the employment relationship, it's different incidents of the employment relationship. The case before you is not an outlier. The case before you involves solely the question of termination and whether it was both a breach of contract and tainted by improper motivation. Counsel, if we kind of take a practical look at it, what preparation did you do on the First Amendment claim that didn't relate to the MOU? Absolutely none. We're familiar with the law in this area. We had researched it before we filed the case. There was no pretrial litigation over whether we had a viable claim as a matter of law, and there was certainly no question about whether we had suspicious facts. All we did at trial was add to the examination of just a few witnesses questions about hostility toward the union and Sergeant Duffy's involvement. That's all we did. And those witnesses were necessary for other reasons, like the practice under the MOU, Duffy's exceptional performance. And I need to address the question of exceptional performance. In their appeal, the defendants still argue that front pay shouldn't have been allowed on the Fourteenth Amendment claim because they had cause to terminate it. Sergeant Duffy, well, we knew that they were going to be headed in that direction. They didn't effectively preserve it by asking for a jury instruction on that question, even though I offered it. They opposed it. But we knew they were headed in that direction from discovery and from their exhibits. So we had to be prepared to argue that Sergeant Duffy shouldn't just get back pay until he found a new job pre-litigation, which he did, fortunately, but he should get front pay because they never gave him a hearing and they never established cause. So the quality of his performance is what the district court seized on as that tremendous amount of work that had to be apportioned to the First Amendment claim, and that is clearly wrong. That's clearly wrong. We had to be prepared to and we were prepared to litigate, and we did litigate, the quality of Sergeant Duffy's performance in order to avoid any argument on the defendant's part that that pay should be the only remedy, not front pay. In fact, as I said, we offered an instruction opposed by the defendants precisely on that question. I argued to the jury. And this is in the supplemental excerpt. If you believe that the defendants established cause for terminating Sergeant Duffy, then don't award any front pay. Just award him back pay until he found his other employment. I did that perhaps, as you know, this was my first jury trial, so what did I know? But there was a reason for it. And the reason was they did their best to litter the record with questions about his performance, just as they did in their opening argument today here on the question of why he needed an extension of probation. I did want the jury not to have my views on whether his performance was satisfactory or not, because there was enough in the record that the jury could have decided to avoid any front pay award at all based upon nagging doubt about whether Sergeant Michael Duffy would have been fired, regardless of whether he had a hearing or not. Now, the reason that. Counsel, I have one question for you, if I may, please. On your last point, if I've got the order of magnitude right, the district court knocked off about one third of the attorney's fees from the Lodestar because of the rejection of the First Amendment claim. So now my question is, if that was excessive, but if there was some work that was extra relating to presenting that, what would have been a fair percentage reduction? Thank you for asking that question, Judge Gould, because I was struggling to get precisely to that point. Once the court concludes, as I hope it will, that this was a common course of conduct, a common core of facts as between the two claims, one successful and one not, then the court doesn't need to apportion time spent as between the two claims because the district court has already decided that we achieved excellent results. And the law in this circuit is that in cases of mixed success as between claims, if at the end of the day the plaintiff achieves excellent results, then there is no need to reduce the Lodestar. That is the law in this circuit under Webb v. Sloan cited in our brief. And that's fine. We have the sites. We have the brief. Okay. I think I just ran out of time. Thank you. Thank you. Ms. Prelogar. Briefly, I'd like to address just the issue of whether or not Sergeant Duffy would be eligible for front pay. And counsel argues that there was no finding that Sergeant Duffy would have been terminated anyway. The jury instruction, it was instruction 53, read that if you find the plaintiff has met the plaintiff's burden of proof, then you must determine whether defendants have shown, by preponderance of the evidence, the plaintiff would have been discharged from plaintiff's employment even if the plaintiff's employment association and support of the labor union activities had not been considered because of the plaintiff's job performance. So for the jury to reach their decision, they, in fact, did have to look at whether or not two things. A, was there motivation based on union activities? And then second, would he have been terminated anyway, whether or not there was some animus based on union activities because of his job performance? The jury had to have considered that in the decision that they reached in saying that he was not terminated because of union activities, they had to have found that he would have been terminated anyway. And the vast majority of the damages in this case, $418,000 and some change, were attributable to future lost economic damages. And in that regard, Sergeant Duffy found employment within a short period of time that he was earning at the city. So that that ---- Pass by me once more why the jury would have found that he would have had to be ---- would have been discharged anyway. Your Honor, because of what they were asked to decide based on the instruction, it was either even if we find union activity was a one motive for the termination, if it had not been considered, was he fired because of his job performance? That was how the instruction read. So by saying he wasn't fired for his union activity, they had to have believed the evidence that they heard that his job performance was the reason for the termination. Well, that doesn't necessarily follow. It might have just been they fired him because they didn't like him. But that wasn't what the jury was asked. The jury was asked to make a decision specifically based on the language of the instruction, or was he ---- was it because of his job performance? And the evidence that they had in front of them to consider was from the plaintiff in terms of his allegation that there was union activity that was the motivation and from the city that there was performance issues that caused them to reach the decision that they would terminate his employment. Thank you. There's a gross misrepresentation that was just made about the jury verdict form. The question was not answered by the jury. The form at page 19 and 20 of the appellant's excerpts of record, volume 1, makes it very clear that there was no answer to the question about whether he was ---- would have been discharged anyway because the form didn't require the jury to go beyond the improper motivation question if they found there was no improper motivation. All right. Okay. Thank you. All right. The case argued is submitted and will stand in recess. All rise. This question should now adjourn. Thank you.
judges: Fletcher B. , Fisher, Gould